**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**WILLIAM W. GOODEN**
Mount Vernon, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**LARRY D. ALLEN**
Deputy Attorney General
Indianapolis, Indiana

**FILED**

Jun 09 2014, 9:18 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JAROD G. ALLRED, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 65A01-1309-CR-393 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE POSEY CIRCUIT COURT
The Honorable James M. Redwine, Judge
Cause No. 65C01-1210-FA-465

**June 9, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Following a bench trial, Jarod G. Allred appeals his two convictions for Class B felony dealing in a Schedule III controlled substance,[1] raising the following issue: whether the State sufficiently proved that the substances Allred sold were Schedule III controlled substances as defined by Indiana Code section 35-48-2-8(e)(4).

We reverse.

## FACTS AND PROCEDURAL HISTORY

The facts most favorable to the judgment are that on May 2, 2012, a confidential informant ("the CI"), who had been working with the multi-department Posey County Narcotics Unit, received a text message on his cell phone from Allred, in which Allred stated he had some "Lortabs" for sale. *Tr.* at 42. The CI contacted Detective Jeremy Fortune of the Posey County Sheriff's Department about the potential purchase from Allred. A deal was arranged between the CI and Allred, and the CI then met with Detective Fortune to prepare for the controlled drug buy. Law enforcement searched the CI's vehicle and provided him with fifty dollars to use for the purchase, and the CI wore audio and video recording equipment during the meeting with Allred. The CI went to Allred's residence, where he lived with his parents, and Allred sold ten pills to the CI for fifty dollars.

At some point thereafter, Allred and the CI engaged in similar text messaging. According to the CI, Allred "still had some that he was trying to get rid of" and wanted to know if the CI had any marijuana to trade for the pills. *Id.* at 45-46. The CI told Allred

---

[1] *See* Ind. Code § 35-48-4-2(a).

2

that he did not but that he had cash, so they set up another deal. Following the same protocol and procedure, the CI went to Allred's house on May 15, 2012, and Allred sold five pills to the CI for twenty-five dollars.

After Allred was arrested, he agreed to an interview with police on October 19, 2012. Allred told Detective Thomas Rueger of the Mount Vernon Police Department that the pills he sold on May 2 and May 15 were "Lortabs." *State's Ex*. 8 at 4. When asked if those are also known as "Hydrocodones," Allred replied, "I believe so, sir." *Id*. Allred explained that the pills had been prescribed to him and that he sold them because he needed money.

The State initially charged Allred with three counts. The first two charged Allred with Class A felony dealing in a Schedule II controlled substance within one thousand feet of a family housing complex, and the third charge was Class D felony maintaining a common nuisance. The State amended the charges so that Count I and Count II charged Class A felony dealing in a Schedule III controlled substance within one thousand feet of a family housing complex; Count III was unchanged.

At the August 2013 bench trial, the State called as a witness Detective Rueger, who had interviewed Allred on October 19, 2012. He stated that Allred was very cooperative and did not ask for an attorney. The videotape and transcript of the interview were admitted as evidence. During the interview, Allred told Detective Rueger that he sold Lortab pills on a couple of occasions, generally toward the end of a month, when he needed money. Allred told Detective Rueger that he had been prescribed the medication as a result of injuries he sustained while serving in the United States Army in Iraq. Allred said it was

3

his recollection that the prescription bottle contained sixty pills and that of that sixty, he sold approximately ten over the course of several months.

The CI also testified for the State. He described arrangement of and the procedures followed during the two May 2012 controlled drug buys from Allred. When he was asked what he purchased from Allred, he replied, "Lortabs." *Tr.* at 42. The CI stated that before the CI became an informant, he and Allred had engaged in approximately ten prior transactions, "mostly" trades, where Allred would provide methadone in exchange for the CI providing marijuana. *Id.* at 51, 53.

Indiana State Police forensic scientist Rebecca Nickless also testified for the State. Nickless testified that the markings on the exterior of the pills indicated that they were Lortab pills. *Id.* at 63, 66. She testified that she analyzed a sample of one of the ten pills that the CI bought from Allred on May 2, 2012. It contained dihydrocodeinone, also known as hydrocodone, a controlled substance, and acetaminophen, a non-narcotic substance. The net weight of the ten pills was 6.51 grams. Nickless also analyzed a sample of one of the five pills that the CI purchased from Allred on May 15, 2012. Like the other sample, it contained dihydrocodeinone and acetaminophen. The net weight of that one pill was .64 grams and the net weight of the remaining pills was 2.60 grams. Nickless testified that each tablet contained 7.5 milligrams of dihydrocodeinone. *Id.* at 69-70.

Allred testified in his own defense. Contrary to what he had told Detective Rueger in the police interview, Allred testified that the "pain killer" pills he sold on May 2 and 15 were not his own; rather, he had stolen them from his parents. *Id.* at 82. Allred also testified

4

that when he was selling the pills to the CI in May 2012, he did not know the type of pain pills that he was selling:

> Q: [W]hat you actually sold him on May 2nd is what?
> A: It was a pain killer.
> Q: Did you know the type of pain killer?
> A: Not at the time, I didn't.

*Id.* at 82. His attorney questioned him about the next sale, occurring May 15:

> Q: Okay. The second sale that you made, what drug did you believe that you sold him?
> A: The same as the first time. Lo lo, or pain killer.
> Q: Did you know which specific pain killer it was?
> A: Not at the time.

*Id.* at 84. When he was asked if he knew they were Lortab pills, Allred replied, "No. I wasn't for sure that they were. I just grabbed them." *Id.* Upon cross examination, the State asked Allred about a couple of Facebook messages that Allred sent to his female cousin a few weeks before trial, asking her for "a big time favor/question," namely, whether she "would be willing to tell [his] attorney" that the CI had contacted her a number of times and the type of pills that the CI wanted to purchase from Allred were "ritalin instead of methadone." *Id.* at 88. He continued, "[Y]ou can say u dont remember what the pill was called but u can say it wasnt lortab[.]" *State's Ex.* 11.

Following the conclusion of evidence, the trial court found Allred guilty of lesser included offenses on Counts I and II, dealing in a Schedule III controlled substance as a Class B felony, and it found Allred not guilty of Count III. Following a subsequent sentencing hearing, Allred now appeals.

5

**DISCUSSION AND DECISION**

Allred argues that there is insufficient evidence that the substances he sold on May 2 and May 15, 2012 were Schedule III controlled substances as defined by the Indiana Code. When reviewing the sufficiency of the evidence, we consider only the probative evidence and reasonable inferences supporting the verdict. *Boggs v. State*, 928 N.E.2d 855, 864 (Ind. Ct. App. 2010), *trans. denied*. We do not reweigh the evidence or assess witness credibility. *Id.* We consider conflicting evidence most favorably to the trial court's ruling. *Id.* We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.* A conviction may be based upon circumstantial evidence alone. *Id.*

With respect to offenses involving controlled substances, the State must prove, as an essential element, the proscribed drug falls within the applicable statutory provision. *Porod v. State*, 878 N.E.2d 415, 417 (Ind. Ct. App. 2007) (citing *Barnett v. State*, 579 N.E.2d 84, 86 (Ind. Ct. App. 1991), *trans. denied*). If a drug is identified in court by a name specifically designated as a controlled substance by the Indiana Code, then the State has proven as a matter of law the drug is a controlled substance. *Id.* If, however, the substance is not specifically enumerated by the Code as a controlled substance, the State must offer extrinsic evidence to prove the substance falls within the Code's definition. *Id.* Our Supreme Court has held that "'[t]he opinion of someone sufficiently experienced with the drug may establish its identity, as may other circumstantial evidence," but noted that "chemical analysis is one way, and perhaps the best way, to establish the identity of a

6

compound.'" *Boggs*, 928 N.E.2d at 864-65 (quoting *Vasquez v. State,* 741 N.E.2d 1214, 1216-17 (Ind. 2001)).

Allred was convicted of two counts of knowingly or intentionally delivering a Schedule III controlled substance, namely dihydrocodeinone. Ind. Code § 35-48-4-2(a)(1)(C). Indiana Code section 35-48-2-8(e)(4) defines what may be considered a Schedule III narcotic containing dihydrocodeinone. It reads:

> (e) Narcotic Drugs. Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation containing any of the following narcotic drugs, or their salts calculated as the free anhydrous base or alkaloid, in the following limited quantities:
>
> (4) Not more than 300 milligrams of dihydrocodeinone, per 100 milliliters[2] or not more than 15 milligrams per dosage unit, with one (1) or more active nonnarcotic ingredients in recognized therapeutic amounts (9806).

The question presented to us is not whether Allred sold drugs. There is sufficient evidence that he did. The CI said that Allred sold him "Lortabs."[3] *Tr*. at 42. Detective Fortune testified that, prior to the CI's controlled drug purchases, law enforcement had been receiving complaints about Allred "dealing Lortabs." *Id*. at 28. Allred told Detective Rueger in the October 2012 interview that he sold "Lortabs."[4] *State's Ex*. 8 at 4. Allred did not dispute that he had asked his cousin prior to trial if she would tell his attorney that

---

[2] Because the substances sold by Allred were not in liquid form, the portion of the statute referring to "not more than 300 milligrams of dihydrocodeinone per 100 milliliters" is not applicable here; the relevant portion of the statute is the latter part stating, "not more than 15 milligrams per dosage unit, with one (1) or more active nonnarcotic ingredients in recognized therapeutic amounts[.]"

[3] We note that the Indiana Code does not identify Lortab by name as being a controlled substance.

[4] Although Allred later testified that he did not know the identity of the pills he was selling to the CI, the trial court as the fact finder was free to believe or disbelieve him. *McClendon v. State*, 671 N.E.2d 486, 488 (Ind. Ct. App. 1996).

7

the pills he sold were Ritalin, not Lortab. Rather, the question Allred presents to us is whether the State presented sufficient evidence that the pills he sold were a Schedule III controlled substance as defined by Indiana Code section 35-48-2-8(e)(4), which required the State to prove that the pills Allred sold contained not more than 15 milligrams of dihydrocodeinone per dosage unit, with one or more active nonnarcotic ingredients in recognized therapeutic amounts. Allred concedes that the pills he sold were comprised of dihydrocodeinone mixed with acetaminophen; he argues, however, the State failed to establish that the acetaminophen contained in the tablets was in a "recognized therapeutic amount" as required by the statute.

In large part, Allred's argument is based on the testimony of Nickless, who, when asked on cross-examination if the acetaminophen was in a recognized therapeutic amount, initially responded, "Yes. Because it was 500 milligrams." *Tr.* at 71. However, when she was further pressed to define the term "recognized therapeutic amount," she stated, "I know what I think it means," namely that the drug was "used in a medicinal way," but acknowledged that that she did not know with certainty the definition of the term. *Id.* at 72. The cross-examination continued:

> Q: Do you know what the therapeutic amounts would be for this non narcotic portion of this pill?
>
> A: I'm not a pharmacist; I'm not a toxicologist, so I cannot answer that. I mean I don't know the answer to that question.

*Id.* Allred's counsel had Nickless confirm that the sample contained less than fifteen milligrams of dihydrocodeinone per dosage unit and one or more nonnarcotic ingredients, and then Allred's counsel asked,

8

Q:      But, you can't testify that that was in recognized therapeutic amounts? Is that fair to say?

A:      I can say that there was 500 milligrams of acetaminophen in there but, what the words recognized therapeutic amounts means, I don't know.

*Id*.; *see also id.* at 73 (stating that she could not testify whether ingredients were in recognized therapeutic amounts). Without that evidence concerning "recognized therapeutic amounts," Allred claims that the State failed to prove an essential element of the crime, and, therefore, did not meet its burden of proving beyond a reasonable doubt that he committed the crime charged.

In support of his position, he relies upon *Barnett*, where a defendant appealed his conviction for possession of a Schedule III controlled substance with intent to deliver. 579 N.E.2d at 85. One of the issues presented on appeal was whether the State had proven that the substance involved was a Schedule III controlled substance. In *Barnett*, the State was required to prove that the substance contained:

(1) Not more than 1.8 grams of codeine, per 100 milliliters or not more than 90 milligrams per dosage unit, with an equal or greater quantity of an isoquinoline alkaloid of opium.

(2) Not more than 1.8 grams of codeine, per 100 milliliters or not more than 90 milligrams per dosage unit, with one (1) or more active, nonnarcotic ingredients in recognized therapeutic amounts.

Ind. Code § 35-48-2-8(e)(2). The chemist testified that the substance was codeine, "a controlled substance," and acetaminophen. *Barnett*, 579 N.E.2d at 87. However, "[n]o testimony was given . . . regarding the quantity of codeine present in each tablet as required by [Indiana Code section] 35-48-2-8." *Id*. Furthermore, the *Barnett* court noted, contrary to the chemist's testimony, codeine, by itself, is not designated as a Schedule III controlled

9

substance. *Id*. Rather, "[t]o bring the drug within the Code's provisions, therefore, additional extrinsic evidence regarding the quantity of codeine by weight and chemical properties of the compound or mixture is required." *Id*. The court determined that the State's failure to establish that the codeine mixed with acetaminophen was a Schedule III controlled substance constituted a failure to prove an essential element of the offense, and, therefore, it reversed Barnett's conviction. *Id*.

*Barnett* is arguably distinguishable from the facts before us in a couple of respects because, in *Barnett*, there was no testimony given regarding the quantity of codeine present in each tablet. In contrast, here, Nickless testified that each tablet contained 7.5 milligrams of dihydrocodeinone. *Tr*. at 69-71. Further, the *Barnett* case does not expressly state whether the chemist testified to the amount of acetaminophen present, whereas Nickless testified that each tablet contained 500 milligrams of acetaminophen. *Id*. at 69-71, 73.

Despite those differences, we find *Barnett* relevant to our analysis. "With respect to offenses involving controlled substances, the State must prove, as an essential element, the proscribed drug falls within the applicable statutory provision." *Barnett*, 579 N.E.2d at 86. Like codeine in *Barnett*, dihydrocodeinone is not a controlled substance listed in Schedule III; it is only a controlled substance if mixed with one or more active, nonnarcotic ingredients in recognized therapeutic amounts. This is what the statute requires. "We cannot . . . parse the definitional portion of the statute, picking and choosing to honor the use of certain words and disregard others[.]" *Hatcher v. State*, 762 N.E.2d 170, 175 (Ind. Ct. App. 2002) (J. Sullivan's concurrence, discussing statutory definition of "manufacture"), *trans. denied*. Although Nickless initially testified that the 500 milligrams

10

was a recognized therapeutic amount, upon further questioning that asked her to explain or define the term "recognized therapeutic amount," she said what she assumed it meant and eventually relented, "I don't know." *Tr.* at 72. "We cannot avoid the legislature's obviously conscious choice of words in drafting the statute," and we conclude that the State's evidence in this case fell short of what our legislature has required the State to prove under Indiana Code section 35-48-2-8(e)(4).[5] *Hatcher*, 672 N.E.2d at 174.

Reversed.

FRIEDLANDER, J., concurs.

BAILEY, J., dissents with separate opinion.

---

[5] We note that our Supreme Court in *Reemer v. State*, 835 N.E.2d 1005, 1008-09 (Ind. 2005), held that expert witnesses or laboratory results are not required to prove composition of over-the-counter or prescription drugs when found in unaltered state and its weight and contents are described in required labeling, which is admissible under hearsay exception. However, in this case, no prescription labeling was offered or admitted.

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JAROD G. ALLRED, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No.  65A01-1309-CR-393 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

**BAILEY, Judge, dissenting.**

The majority reverses Allred's convictions for Dealing in a Schedule III Controlled Substance, as a Class B felony, on the basis of insufficiency of the evidence presented at trial.  Because I disagree with the majority's conclusion that the evidence was insufficient to sustain the conviction, I respectfully dissent.

Allred was convicted under Indiana Code subsection 35-48-4-2(a)(1)(C), which makes it a Class B felony to knowingly or intentionally deliver a pure or adulterated controlled substance, classified in schedule I, II, or III.  Here, Allred was charged with distributing dihydrocodeinone.  Our statutes designate that drug as a schedule III narcotics narcotic if it meets the following criteria:

> Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation containing any of the following narcotic drugs, or their salts calculated as the free anhydrous base or alkaloid, in the following limited quantities:

(4) Not more than 300 milligrams of dihydrocodeinone, per 100 milliliters or not more than 15 milligrams per dosage unit, with one (1) or more active nonnarcotic ingredients in recognized therapeutic amounts (9806).

Ind. Code Ann. § 35-48-2-8(e). To obtain a conviction under Section 35-48-4-2 as charged, then, the State had to prove beyond a reasonable doubt that the Lortab pills Allred sold satisfied the statutory requirements for a schedule III narcotic.

The majority fixes on the statutory phrase, "one or more active nonnarcotic ingredients in recognized therapeutic amounts," id., and holds that because the State did not provide testimony that the nonnarcotic portion (here, acetaminophen) of the tablets Allred sold was a therapeutic amount, the State's case fails for lack of proof. The majority correctly notes that chemical analysis and testimony of someone sufficiently experienced with a drug may be the best evidence that a drug belongs to a certain schedule, Boggs v. State, 928 N.E.2d 855, 864-65 (Ind. Ct. App. 2010). Then the majority holds that testimony of Nickless, the State's expert witness, failed to establish that the acetaminophen in the Lortab pills was present in a recognized therapeutic amount. And in a footnote, the majority distinguishes this case from that of our supreme court's holding in Reemer v. State, noting that in Reemer there was hearsay evidence in the form of a pharmaceutical label establishing the identity of the drug in question, whereas here no such labelling exists. Slip Op. at 11 (citing Reemer, 835 N.E.2d 1005, 1007-10 (Ind. 2005)).

Consistent with Reemer, expert testimony is not the only evidence that will suffice to sustain a conviction. Boggs, 928 N.E.2d at 864-65. Nor, I think, is a pharmaceutical label necessary in each case. Here, there was evidence in the form of both Allred's post-

13

Miranda statements to Detective Fortune that Allred possessed Lortab issued under a prescription. This supports the requirement of Subsection 35-48-2-8(e)(4) that the nonnarcotic ingredients of the pills were in recognized therapeutic amounts. During his post-Miranda statement to Detective Fortune, Allred indicated that he obtained Lortab pills as the result of a prescription issued after he was injured during his military service, and Allred does not now contest the admissibility of that statement. At trial, he testified that he didn't know what pills he was selling, but that he had obtained them from his parents' medications. And Nickless, the State's chemist, testified that the pills contained dihydrocodeinone and acetaminophen.

Given this evidence—in particular Allred's multiple statements indicating that he knew he was selling a prescription drug of some kind, whether through his own prescription or that of one of his parents—I think that there was sufficient evidence for a reasonable fact-finder to infer that the Lortab pills Allred sold were proved to be schedule III narcotics. Accordingly, I would affirm Allred's convictions, and must therefore, respectfully, dissent.